IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

XOCHITL JAZMIN VELASCO PADILLA, )
                                       )
      Petitioner,            )      Case No. 4:16-cv-00024
                                       )
v.                                     )      **MEMORANDUM OPINION**
                                       )
JOE RICHARD TROXELL,        )      By: Hon. Jackson L. Kiser
                                       )           Senior United States District Judge
     Respondent.           )

On May 23, 2016, Petitioner Xochitl Jazmin Velasco Padilla ("Petitioner") filed a Petition for Return of Child ("the Petition") [ECF No. 1], pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") and the International Child Abduction Remedies Act. In her Petition, she claimed that her son, J.V., was brought into this country without her consent and in contravention of her custody rights by the child's legal father, Respondent Joe Richard Troxell ("Respondent"). I held a bench trial on the Petition on July 25, 2016. For the reasons stated herein, I will deny the Petition.

"To address 'the problem of international child abductions during domestic disputes,' in 1980 the Hague Conference on Private International Law adopted the [Convention]." Lozano v. Montoya Alvarez, 134 S. Ct. 1224, 1228 (2014) (quoting Abbott v. Abbott, 560 U.S. 1, 8 (2010)). "The United States ratified the Hague Convention in 1988, and Congress implemented the Convention that same year through the International Child Abduction Remedies Act (ICARA)." Id. at 1229 (citing 102 Stat. 437, codified at 22 U.S.C. §§ 9001–9011). By its terms, the Convention addresses the signing countries' desire "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure

their prompt return to the State of their habitual residence, as well as secure protection for the rights of access . . . ." Hague Convention § I, 19 I.L.M. 1501, 1501 (1980).

"A primary aim of the Convention is to deter parents from taking children across international borders in search of a more sympathetic court to resolve custody disputes. To that end, the Convention's central operating feature is the 'return remedy': when a child under the age of 16 has been wrongfully removed from his . . . country of habitual residence, the country to which the child has been brought generally must order the prompt return of the child." Alcala v. Hernandez, Case No. 15-2471, 2016 WL 3343251, at *4 (4th Cir. June 15, 2016) (citing Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001)). This order, however, does not affect the respective custody rights of the parents; "the Convention generally leaves ultimate custodial decisions to the courts of the country of habitual residence." Id.

In order to state her claim for return of the child, Petitioner must show, by a preponderance of the evidence, that J.V. was wrongfully removed (or retained) from his habitual residence in violation of her custody rights.[1] See Miller, 240 F.3d at 398 (citing Hague Convention, art. 3, 19 I.L.M. at 1501). Based on the evidence, I believe Petitioner has made this showing. Respondent has established, however, that Petitioner consented to J.V. being brought into this country. Because consent of the petitioning parent is a defense to the Petition, see Hague Convention art. 13a, 19 I.L.M. at 1502,[2] and because Respondent has adequately shown

---

[1] In order to show a violation of her custody rights, Petitioner must also show that she was exercising those rights at the time of the wrongful removal or retention. See Miller, 240 F.3d at 398 (citing Hague Convention, art. 3, 19 I.L.M. at 1501).

[2] I note, in passing, that "consent" would seem to obviate the "wrongful" element of Petitioner's prima facie case, but the Convention nevertheless presupposes that one parent may consent to wrongful removal.

- 2 -

that Petitioner consented to J.V.'s removal from Mexico,[3] I will not order J.V. returned to his home country.[4]

The evidence established that, although Respondent is not J.V.'s biological father, he is listed on J.V.'s birth certificate as his father and was so listed with the full consent of both Petitioner and Respondent. Under Mexican law, as stipulated by the parties, Respondent enjoyed the same parental rights as Petitioner. (See Joint Pretrial Stipulation ¶ 4, July 25, 2016 [ECF No. 48].)

Respondent first met J.V. in January 2012 when J.V. was approximately eight months old.[5] At that time, Respondent was added as J.V.'s father on J.V.'s birth certificate. Over the next two years, Respondent had no contact with J.V. Around January 2014, Petitioner contacted Respondent and stated that J.V. wanted to meet him. Respondent picked up Petitioner and J.V. at the bus station, and they stayed with Respondent and his fiancée for several days at Respondent's home in Acapulco.

In December of 2014, Petitioner and Respondent discussed Petitioner's desire to live in the United States and whether J.V. would be better off with Respondent. According to

---

[3] The Convention also applies when a child is wrongfully retained in a foreign country. Such a case would typically arise where the left-behind parent initially consented to the removal of the child from the country of his or her habitual residence, but the child was not returned on an agreed-upon date. See, e.g., Hon. James D. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 24 (2012), available at http://www.fjc.gov/public/pdf.nsf/lookup/ hagueguide.pdf/$file/hagueguide.pdf. Here, Petitioner has failed to offer any evidence to show that there was an agreement to return J.V. to Mexico at any time. As such, she has failed to establish the necessary elements of a prima facie case of wrongful retention under the Convention.

[4] Although I will not order J.V. returned to Mexico, I remind the parties that Mexico is the proper venue for establishing the legal custody of J.V. I encourage Respondent to return to Mexico with J.V. and settle this matter legally.

[5] J.V. was born on May 27, 2011. (See Pl.'s Trial Ex. 4.)

Respondent, Petitioner said her other two sons[6] were born in the United States, so they were U.S. citizens, but that she would have a problem moving with J.V. Respondent agreed to help Petitioner get papers for J.V. and bring him to the United States.[7]

After J.V.'s passport was secured in December 2014, J.V. returned with Respondent to his home in Acapulco. A few months later, Respondent acquired a "fiancée visa"[8] for Blanca Leyva, which permitted Leyva to enter the United States for ninety days to marry Respondent. According to Respondent, it would have taken too long to get a visa for J.V., so he paid a smuggler to take the three-year-old J.V. across the U.S./Mexican border.[9] Predictably, J.V. was picked up during a raid by Border Patrol near El Paso, Texas. After a review of his documents, J.V. was released into Respondent's custody, and Respondent, J.V., and Leyva settled in Halifax County, Virginia.

---

[6] It was uncovered at trial that Petitioner had a child prior to J.V., despite her initial testimony that J.V. was her first child.

[7] This version of events is supported by the sworn statement of Maria Luisa Baños Basil (Def.'s Trial Ex. 12). At trial, I reserved ruling on the admissibility of this statement. Petitioner objected on the grounds that the statement was not authenticated by testimony and was not self-authenticating under Federal Rule of Evidence 902(3). Respondent countered that the document was self-authenticating under Rule 902(8) because it was signed by a notary in Mexico. Although Rule 902(8) does not expressly apply to documents executed by a foreign notary, it does not exclude such documents from its reach. Exhibit 12 advised the declarants of the penalties (in Mexico) for perjury, includes copies of the declarants' identifications, and contains Lic. Hugo Manuel Felix Garcia's notarial seal and signature. There is no allegation that Mexican notaries are not empowered to notarize such documents; as such, I find Exhibit 12 to be self-authenticating under Federal Rule of Evidence 902(8). The document will be admitted as evidence.

[8] "The K-1 visa permits the foreign-citizen fiancé(e) to travel to the United States and marry his or her U.S. citizen sponsor within 90 days of arrival." U.S. Department of State, Nonimmigrant Visa for a Fiancé(e) (K-1) (2016), available at https://travel.state.gov/content/visas/en/immigrate/family/fiance-k-1.html.

[9] To be sure, this decision raises serious doubts about Respondent's fitness as a parent. That issue, however, is not for this Court to decide.

Petitioner offered a vastly different story. She agrees that she wanted Respondent on J.V.'s birth certificate, and she agrees that she went with Respondent to acquire a passport for J.V. in December 2014; she contends, however, that Respondent took J.V. without her knowledge or consent. According to her, their group[10] was at the park the day after acquiring J.V.'s passport. She maintains that she went to get ice cream, and when she returned, Respondent and his fiancée had disappeared with J.V. She subsequently swore out a warrant against Respondent for abducting J.V.

I cannot find Petitioner's version of events to be true.[11] First, she has offered no explanation why she would have consented to acquiring a passport for her three-year-old son unless there were plans for him to travel to the United States. Considering her lack of legal status in the United States, the only plausible reason for acquiring a passport for J.V. would have been Petitioner's awareness of, and consent to, Respondent's plans to bring J.V. to the United States.

Secondly, the evidence adduced at trial indicated that Petitioner had no objection to J.V. residing with Respondent in the United States. In various text messages to Respondent and Blanca Leyva, Petitioner stated: "Blanca come to Oaxaca and bring my son I swear I won't do

---

[10] Petitioner, Respondent, Leyva, and J.V.

[11] While there is some evidence to support Petitioner's version of events (for example, she swore out a warrant against Respondent for abduction shortly after he left with J.V. in December of 2014), it appears Petitioner acquiesced to the arrangement as long as Respondent was willing to support her financially. (See, e.g., Def.'s Trial Ex. 7, at pgs. 051–072, 103–110, 113–114.) On February 4, 2016, Petitioner asked for money, and when she was rebuffed by Respondent, she stated: "No Joe for your information I don't care about the money what I care about is getting my son back". (Id. at pg. 119.) This appears to be the first time Petitioner made overtures about having J.V. returned to her custody. Up to that point, she had routinely blamed her mother's machinations for the legal wrangling to return J.V. (See, e.g., id. at pg. 031 ("[W]hat can I do it's because my mother made that movement"); id. at pg. 057 ("[D]on't pay any attention to her [Petitioner's mother] I barley [sic] talk to her leave her alone I am the one who is important . . . I do not agree with her she doesn't even know that I am in contact with you guys . . . What I do is what's important not what she does . . . I don't agree with her . . . Yes Blanca if [Respondent] will help me I will do everything to stop this my mother did not say anything to me about that")).

anything against you guys . . . I just want to see him I am not going to fight for him" (Def.'s Trial Ex. 7, at pg. 027); and "Joe please this is urgent you don't understand my son is very sick I swear to you I will do everything for [J.V.] to be with you but I really need the money answer me now please" (Def.'s Trial Ex. 8, at pg. 003). When Respondent asked Petitioner "what . . . is better for the life of [J.V.]," Petitioner responded, "I said you." (Id. at pg. 007.) When Respondent asked, "[W]hat [do] you think is best for [J.V.]'s life where the best place for [J.V.] to live is," Petitioner responded, "I think with you . . . ." (Def.'s Trial Ex. 7, at pg. 141.)

Finally, Petitioner's testimony raised serious doubts about her credibility. While some of the discrepancies could conceivably be chalked up to the language barrier or societal differences,[12] there can be no dispute that Petitioner's testimony regarding her other children was plainly false. She testified that J.V., born May 27, 2011, was her first child. On cross examination, she was forced to admit that she gave birth to a child on August 29, 2008, when she was seventeen. (See Def.'s Trial Ex. 18.) The ease with which she mislead the court on this issue calls into question all of her factual testimony. Thus, I am left with only one credible version of events: Respondent's.

Unfortunately ICARA does not vest with this Court the power to determine what is best for J.V.; instead, I am only asked to determine whether Respondent abducted J.V. from Mexico, or whether Petitioner consented to his removal. The evidence established that Petitioner consented to his removal and had no objections to J.V. remaining in Respondent's care so long as Respondent supported her financially. (See, e.g., Def.'s Tr. Ex. 7, at pg. 57 ("[I]f Joe will help me I will do everything to stop this . . . ."). The Petition will be denied.

---

[12] For example, there was ample evidence to establish that Petitioner resided in Barrio del Nino, Oaxaca, for an extended period of time, but Petitioner insisted that she resided nearly six hours away, in Rio Grande, Oaxaca. Whether this amounts to confusion over the meaning or translation of "lived," a societal construct regarding residence, or an outright falsehood is unclear. Nevertheless, I give Petitioner the benefit of the doubt on this discrepancy.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 28th day of July, 2016.

      s/Jackson L. Kiser
      SENIOR UNITED STATES DISTRICT JUDGE